UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA KERN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CV-00884-SPM |
| | ) | |
| ST. CHARLES COUNTY, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This case is before the Court on Defendants' Motion for Summary Judgment. (Doc 39). The motion has been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 24).

I.   **FACTUAL BACKGROUND**[1]

A.  **The Events of May 20, 2019**

On May 20, 2019, Plaintiff Cynthia Kern's son, Anthony Soliz, was transferred from the St. Francois County Jail to the St. Charles County Jail ("the Jail"), where he was held on warrants for unlawful use of a weapon, a traffic offense, and a felony probation violation. Soliz was not suffering from, or exhibiting signs of, a medical condition or issue at the time of his admission to the Jail. Soliz arrived at approximately 4:00 p.m., was booked into the jail at 9:35 p.m., and was placed in a large holding cell identified as "R-7." At 10:24 p.m., Defendant Eric Bishop (a correctional officer) entered R-7 to retrieve an outgoing inmate's mattress and blanket. An inmate told Bishop the toilet was "clogged up."[2] Bishop looked at the toilet and saw trash in it, told the

---

[1] Except as otherwise noted, these facts are taken from the parties' respective statements of undisputed facts.

[2]  Cameras recorded R-7, permitting the parties to cite precise times.

1

inmate that he (Bishop) would notify a supervisor, and notified a supervisor so that someone could be brought in to clean and unclog the toilet. Bishop was in R-7 for approximately fifteen seconds, roughly two seconds of which was devoted to glancing at the toilet. He did not look at anything else that was lying around, and at the time of his deposition, he had no recollection about what, if anything, was on the floor around the toilet. Soliz did not display or exhibit any signs or symptoms of medical needs during the time Bishop was in R-7. Bishop did not re-enter R-7 after that time on May 20. Bishop did not know Soliz prior to May 20, 2019.

At 10:36 p.m., inmate Timothy Snead retrieved an object or substance, later determined to be a capsule of fentanyl, from the floor near the toilet in R-7. At 10:38 p.m., Snead gave the fentanyl to Soliz. Soliz examined the fentanyl and spoke with other inmates. At 10:41 p.m., Soliz ingested the fentanyl. At 10:45 p.m., a correctional officer entered R-7 and briefly spoke with Soliz, and at 10:46 p.m., a correctional officer gave Soliz a cup at the door to R-7. Around 11:00 p.m., the lights were turned off, and Soliz lay down to go to sleep. At 11:51 p.m., Snead discovered Soliz was non-responsive and notified correctional officers. At 11:52 p.m., booking officer Justin Lundsford entered R-7. Lundsford attempted a sternum rub on Soliz to try to get a response and told another officer to call a medical emergency on the radio and get the jail nurse. Lundsford, Corporal George Basler, the jail nurse, and other officers performed CPR and applied the automatic external defibrillator. Medical treatment by the jail nurse and correctional officers continued until EMS arrived at 12:05 a.m. Soliz died in R-7.

Keen has been the Director of Corrections for St. Charles County since May 23, 2018. Keen did not know that Soliz had a drug problem and was not present when Soliz ingested fentanyl. After being notified of a non-responsive inmate, Keen went to the jail and saw Soliz lying on the floor in R-7.

**B.   Jail Policies, Practices, and Past Relevant Incidents**

As of May 20, 2019, inmates entering the Jail were pat searched and strip searched before they entered R-7. During strip searches, inmates were instructed to remove their clothes; their clothes were searched; their fingers, ears, mouth, penis, scrotum, and feet were examined; and inmates were directed to squat and cough hard three times. There was conflicting deposition testimony from officers regarding when the Jail also began using a body scanner (an electronic device that scans inmates bodies in an effort to find hidden contraband), and whether it was before or after the date Soliz died. *See* Def.'s Ex. F, Doc. 41-3, Lundsford Dep. at 36:3-9; Def.'s Ex. G, Doc. 41-4, Basler Dep. at 15:20-22; Def.'s Ex. H, Doc. 41-5, Keen Dep. 17:20-25, 18:1-5. However, the written policy requiring body scans has an effective date of February 21, 2019, and a handwritten body scan log covering the period from May 17, 2019, through May 22, 2019 shows that several dozen body scans were logged during that time, including a scan for Soliz at 4:52 p.m. Def.'s Ex. M, N. The policies in place at the Jail on May 20, 2019, included a "Facility Housekeeping" Policy, a "Contraband Control" a "Searches" Policy, and a "Body Scanner" Policy.

The Facility Housekeeping policy states, "Corrections staff shall be responsible for supervising and inspecting the **daily** cleaning and sanitation performed by the inmates working in their assigned areas." However, in May 2019, the Jail's institutional maintenance officer and his inmate crew cleaned the booking areas four times a week, in the morning. Booking officer Lundsford testified that only inmates, but not booking officers, clean R-7. Corporal Basler believed that the policy of cleaning four times per week was not a best practice for keeping inmates in R-7 safe, because it only ensured that contraband was not in Unit R-7 during those four cleanings. Bishop testified that he had no duty to personally clean up trash located in R-7 and that he had no duty to have the inmates clean up trash located in R-7. Bishop testified that personally, he had not seen trash hiding contraband, but that "maybe" it could happen. Def.'s Ex. E, Bishop Dep. 39:16-

3

20. Bishop testified that he is "not going to pick someone else's trash up."

Director Keen testified that "There should be cleaning in [R-7] any time that an officer sees any type of dirt or garbage. It should be done immediately." All of the corrections officers working under Director Keen understand his "expectation of cleanliness of their areas. Once [they] take over this position, this is [their] area, and [they] need to make sure it is clean. And that the security measures are done while it is under [their] charge." All persons trained as guards are expected to "do whatever it takes to take care of the area." Director Keen did not recall specifically discussing with his officers his expectations of cleanliness of R-7. Ex. H, 39:8-16.

At the time of Soliz's death, Director Keen described Unit R-7 as being "dirty." Asked about the investigation after Soliz's death, Keen stated, "What could we have done better? . . . The downfall was the cleanliness of the unit, or that cell." Ex. H, Keen Dep., at 51:2-12. Corporal Basler agreed that R-7 was "a pretty big mess" the night Soliz died, and that when R-7 is dirty, and that corrections officers cannot be assured that there is no contraband in R-7.

In the year prior to Soliz's death, there were at least five incidents at the Jail involving narcotics. On August 20, 2018, an inmate overdosed on heroin, and heroin was found in the inmate's bra. On August 28, 2018, it was reported to Jail staff that an inmate had heroin on the booking bench. On November 6, 2018, an inmate overdosed at the Jail, resulting in death. On December 10, 2018, it was reported to Jail staff that there were possible drugs in a small bag on the booking area floor. On February 20, 2019, an inmate smuggled fentanyl into the Jail.

In or around June 2010, the National Institute of Corrections prepared a comprehensive facility assessment of the Jail, at the request of the then-Director of Corrections for the St. Charles County Department of Corrections. The NIC Assessment notified the County of various problems with the booking area in the Jail that impacted the safety and wellbeing of inmates and staff. Specifically, the NIC Assessment made the following findings:

4

A. The physical design of the booking area does not consistently allow for the safety and security of both staff and prisoners. The fact that this critical operational component seems almost thrown-together at certain points in the process leads to inefficiency and occasional irregularities in the processing of arrested individuals. The processing functions such as searching, booking, mugshots, and acceptance of money, inmate property and fingerprinting do not take place in areas designed for such functions. These tasks are spread-out in multiple use areas. For example, the initial acceptance and receipt of a prisoner's money and property occurs in a primary corridor. The taking of mugshots and ingress/egress doors into both the enclosed booking area and the female confinement area are all located in extremely a high-traffic hallway.

B. Compound this "front-end" activity with other operational tasks occurring in this room; breathalyzer testing and police interviewing, and you have created an atmosphere for potential bedlam.

C. More problematic is the matter of mixing inmates who are in varying stages of movement. Field arrest prisoners still found in their civilian clothing are often seated aside a processed inmate preparing to leave for court or perhaps one returning to the institution from an outside clinical appointment. All intake and release functions, as well as transports, are performed within this small, general booking area.

Nothing was done to address these issues between 2010 and May 20, 2019.

Keen testified that people coming into and going out of the Jail were handcuffed to the same bench in the booking area, creating an "almost inevitable" risk of cross-contamination, whereby "law enforcement, corrections staff, arrestees, and inmates awaiting movement intermingle, creating major security issues." Two other Jail correctional officers testified that because the layout placed in proximity people who had been searched an people who had not, it created more of an opportunity for contraband to enter the Jail. Corporal Basler discussed his concerns about the booking area with one or more supervisors. Correctional officer Robert Reynolds' testified that "keeping contraband out of Booking and R7 was a challenge."

The length of time inmates were held in booking was another issue. Keen testified that at the time of Soliz's death, there were inmates that would have been in R-7 for more than a day at a time, which Keen stated creates risk because "you are mixing different classifications. And then you have individuals exposed to different types of individuals. You don't know what they have on

them. If they do have [contraband and drugs] internally, there is the possibility of them passing it on."

On July 2, 2020, Plaintiff Cynthia Kern filed her Complaint in this action. In her Complaint, Plaintiff alleges the following claims: (I) failure to maintain a safe environment and to provide adequate medical care, pursuant to 42 U.S.C. § 1983; (II) failure to maintain appropriate policies, customs, and practices and failure to train, supervise, and retain, pursuant to 42 U.S.C. § 1983 (III) negligence *per se*, based on violation of Mo. Rev. Stat. § 221.120; and (IV) wrongful death, pursuant to Mo. Rev. Stat. § 537.080. Three defendants remain in the case: St. Charles County, Missouri ("the County"); Daniel Keen, and Eric Bishop. Defendants now move for summary judgment on all claims.

## II.    LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Gannon Int'l, Ltd. v. Blocker,* 684 F.3d 785, 792 (8th Cir. 2012). An dispute about a material fact is genuine, making summary judgment inappropriate, when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh

6

the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

### III.   DISCUSSION

### A.  Federal Claims

Although the Complaint does not set forth each specific claim separately, the Complaint and the parties' briefing make it clear that Plaintiff is asserting four distinct federal claims in this case, each based on violations of Soliz's Eighth and Fourteenth Amendment rights: (1) a failure to prevent harm claim against Bishop and Keen in their individual capacities, alleging that that these defendants violated Soliz's constitutional rights by failing to keep the jail free from illegal narcotics; (2) a failure to train and supervise claim against Keen, in his individual capacity, alleging that Keen failed to properly train and supervise his employees on keeping the jail free from illegal narcotics; (3) a deliberate indifference to medical needs claim against Bishop and Keen, in their individual capacities; and (4) a claim that St. Charles County, and Keen in his official capacity, failed to maintain appropriate policies, customs, and practices to keep the jail free from illegal narcotics, and failed to train and supervise correctional offers on that subject.

With respect to the claims asserted against Defendants in their individual capacities, Defendants argue that they are entitled to summary judgment both because no constitutional violation occurred and because even if one did occur, they are shielded by qualified immunity because Defendants' conduct did not violate a clearly established constitutional right. "'Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). A government official is entitled to qualified immunity unless "(1) the facts alleged or shown, construed in the light most

favorable to [the plaintiff], establish a violation of a constitutional or statutory right, and (2) the right was clearly established as of [the date of the alleged violation], such that a reasonable official would have known that his actions were unlawful." *Edwards v. Byrd*, 750 F.3d 728, 731-32 (8th Cir. 2014) (internal quotation marks omitted). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotation marks omitted). In order for a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al- Kidd*, 563 U.S. 731, 741 (2011). "The determination of whether an officer is entitled to qualified immunity requires consideration of the 'objective legal reasonableness' of the officer's conduct in light of the information he possessed at the time of the alleged violation." *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017) (quoting *Winters v. Adams*, 254 F.3d 748, 766 (8th Cir. 2001)).

### 1. Failure to Prevent Harm Claim (Against Keen and Bishop in Their Individual Capacities)

The Court first considers the failure to prevent harm claim against Bishop and Keen in their individual capacities. Plaintiff alleges that Bishop and Keen demonstrated deliberate indifference to Soliz's health and safety in that failed to keep the jail free from illegal narcotics.

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The Eighth Amendment, which prohibits 'cruel and unusual punishments,' imposes a duty on prison officials to, among other things, "ensure that inmates receive adequate food, clothing, shelter, and medical care" and to "'take reasonable measures to guarantee the safety of the inmates,'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27

8

(1984)). Because Soliz was a pretrial detainee, his "relevant constitutional rights arise under the Due Process Clause of the Fourteenth Amendment" rather than the Eighth Amendment. *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014). "[P]retrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." *A.H. v. St. Louis Cty., Missouri*, 891 F.3d 721, 726 (8th Cir. 2018) (quoting *Luckert v. Dodge Cty.*, 684 F.3d 808, 817 (8th Cir. 2012)). The Eighth Circuit has noted, "Although this court has yet to establish a clear standard for pretrial detainees, we repeatedly have applied the same 'deliberate indifference' standard as is applied to Eighth Amendment claims made by convicted inmates." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010) (quoting *Vaughn v. Greene County, Ark.*, 438 F.3d 845, 850 (8th Cir. 2006)). *See also Edwards*, 750 F.3d at 733 ("A jail official violates the Due Process Clause . . . when he is deliberately indifferent to a substantial risk of serious harm to a pre-trial detainee and fails to protect the detainee.").

To prove an unconstitutional failure to prevent harm, Plaintiff must satisfy a two-prong test. First, he must show that he was "incarcerated under conditions posing a substantial risk of serious harm"; this prong is viewed objectively. *Farmer*, 511 U.S. at 834. Second, Plaintiff must prove that Defendants acted with deliberate indifference to the substantial risk of serious harm; this requirement is subjective. *Id*. at 837-38. *See also, e.g.*, *Vandevender v. Sass*, 970 F.3d 972, 975 (8th Cir. 2020) (describing two-prong test); *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010) (same). To satisfy the second prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference is "something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) (internal quotation marks omitted). Whether a defendant knew of a risk of harm is determined from the defendant's perspective at the

time in question, "not with hindsight's perfect vision." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

Defendants argue that there is no evidence from which a reasonable juror could find that either prong of this test was satisfied. With regard to the first prong, Defendants argue that "[n]o record evidence establishes there was any objective risk of serious harm to Soliz," and that "[t]he only risk resulted from his decision to ingest a substance found on a jail holding cell floor, which Soliz did freely and voluntarily after he examined the fentanyl for over three minutes and spoke with other inmates." Def.'s Mem. Supp. S.J., Doc. 40, at 6. With regard to the second prong, Defendants argue neither Keen nor Bishop actually knew that Soliz "could or would ingest fentanyl on May 20, 2019." *Id.*

In her response, Plaintiff argues that Bishop knew that trash in a jail cell could hide contraband or drugs, understood Keen's expectation that there should be immediate cleaning in R-7 any time that an officer sees any type of dirt or garbage, observed the area near the toilet in R-7 where the fentanyl capsule was found shortly before it was found, and unreasonably decided not to clean up the trash in R-7. Plaintiff provides no argument in response to Defendants' summary judgment motion on this claim with respect to Keen; the Court therefore considers the claim against Keen waived.[3]

---

[3] *See Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Wegmann v. Ethicon, Inc.*, No. 4:20-CV-00704 JAR, 2020 WL 5814475, at *11 (E.D. Mo. Sept. 30, 2020) (The failure to oppose a basis for summary judgment constitutes waiver of that argument"), reconsideration denied, No. 4:20-CV-00704 JAR, 2020 WL 6680893 (E.D. Mo. Nov. 12, 2020). Even absent a waiver, however, the Court finds that Keen would be entitled to summary judgment on this claim, for the reasons stated in Defendants' motion.

Plaintiff does argue that Keen is personally liable for his failure to train employees, which Plaintiff treats as a separate claim. The Court will address that claim *infra.*

With respect to the first prong of the analysis, neither party cites any cases addressing whether, or under what circumstances, an inmate's risk of exposure to illegal drugs that he could voluntarily ingest constitutes an "substantial risk of serious harm" for purposes of a failure to prevent harm claim. The Court's own research has revealed no Eighth Circuit cases on point. Some courts in other jurisdictions have suggested that the risk of exposure to illegal drugs inside a jail or prison does not implicate the Eighth Amendment, at least absent facts suggesting that the risk of exposure to drugs was greater inside the facility than outside of the facility. *See Smith v. Connections CSP, Inc*, No. CV 17-1733-RGA, 2018 WL 1433840, at *4 (D. Del. Mar. 20, 2018) (dismissing prisoner's Eighth Amendment claim for unlawful conditions of confinement where the prisoner had a history of drug abuse and alleged that he was placed in an unsafe environment surrounded by drugs; stating, "Plaintiff's alleged expos[ure] to illegal drugs in a prison does not violate his constitutional rights"); *Alexander v. Padvaiskas*, No. 14-13675-NMG, 2015 WL 10433618, at *3 (D. Mass. Dec. 2, 2015) (dismissing Eighth Amendment claim brought by personal representative of inmate who died after overdosing on heroin that had been smuggled into a facility; stating, "because plaintiff does not contend that the risk of exposure to drugs was greater inside the . . . lockup than outside of state custody, to find that [Defendant] violated [the inmate's] constitutional rights by failing to monitor her in prison would be to conclude that inmates are constitutionally entitled to greater protection from the effects of illicit drugs than unincarcerated citizens. For several reasons this cannot logically fall within the ambit of the Eighth Amendment.") (internal citations omitted); *Nunez v. Salamack*, No. 88 CIV. 4587 (MGC), 1989 WL 74940, at *1 (S.D.N.Y. June 26, 1989) (dismissing Eighth Amendment claim brought by a prisoner who sought a transfer because of drug use by other prisoners; stating, "[t]he alleged failure to provide [the plaintiff] with a drug-free environment does not state a claim against [a prison official]"; reasoning that "the Eighth Amendment does not guarantee [the plaintiff] the right to be incarcerated in a

drug-free environment" and that because the plaintiff had not alleged that the risk of exposure to drugs were greater inside the facility than outside it, acceptance of his argument would require finding that "imprisoned felons are constitutionally entitled to more protection . . . than are law-abiding citizens") (quotation marks omitted);. *Cf. Brock v. Logsdon*, No. 19-CV-6082, 2019 WL 6841544, at *6 (W.D.N.Y. Dec. 16, 2019) (dismissing Eighth Amendment claim based on allegations that officers who searched an inmate failed to uncover the drugs apparently secreted on the inmate's person; stating, "[t]here is no constitutional right to a thorough search").

Other courts have suggested that officials' failure to prevent exposure to illegal drugs in a jail or prison might support an Eighth Amendment cause of action, but have rejected such claims because of the absence of support for the second prong—that the defendants were subjectively aware of facts indicating a risk that a particular inmate would ingest illegal drugs and actually drew the inference that the risk existed. *See Est. of Zakora v. Chrisman*, No. 1:19-CV-1016, 2021 WL 5019034, at *7 (W.D. Mich. July 23, 2021) (stating, "[i]f a prison official has a duty to protect a suicidal inmate from self-harm, perhaps the Eighth Amendment would compel a prison official to protect a prisoner from self-harm resulting from taking illegal drugs," but dismissing a claim because the plaintiff had not alleged that the defendant "subjectively aware of facts indicating a risk that [the decedent inmate] would ingest illegal drugs and that he actually drew the inference"), report and recommendation adopted, No. 1:19-CV-1016, 2021 WL 4129209 (W.D. Mich. Sept. 10, 2021); *Hampton v. Hamm*, No. 2:20-CV-385-WKW, 2022 WL 69214, at *8 (M.D. Ala. Jan. 6, 2022) (dismissing deliberate indifference claim where the plaintiff did "not allege that any prison official knew that Decedent was likely to harm himself by ingesting illegal drugs" but only that Defendants' policies "failed to prevent the flow of illegal drugs into the Alabama Prison System"); *James v. Bartow Cty., Georgia*, No. 1:16-CV-01381-WSD, 2017 WL 748738, at *7 (N.D. Ga. Feb. 27, 2017) (dismissing § 1983 claim where the plaintiff alleged that jail officials

recognized that the jail must prevent introduction of contraband into the facility, that the jail's screening and search procedures were cursory and inadequate, that the jail allowed the introduction of contraband on a regular basis, that jail officials had failed to protect the inmate from the flow of illegal drugs into the jail, and that an inmate died of a drug overdose as a result; stating, "it is not enough to generically allege an influx of drugs into the jail, Plaintiff's Complaint must also demonstrate that each individual County Defendant subjectively knew of the risk of [the inmate]'s ingesting the illegal drug from the influx."); *aff'd*, 798 F. App'x 581 (11th Cir. 2020).

Here, even assuming, without deciding, that Soliz was subjected to an objective, substantial risk of serious harm, the Court finds that Bishop is entitled to summary judgment based on the second prong of the deliberate indifference analysis. There is no evidence from which a jury could conclude either that Bishop was actually aware of facts indicating a risk that Soliz would ingest illegal drugs or that Bishop actually drew the inference that there was a risk that Soliz would ingest illegal drugs. Viewed in the light most favorable to Plaintiff, the relevant facts are these. A few minutes before inmate Snead retrieved the fentanyl capsule from the floor near the toilet, Bishop spent fifteen seconds in R-7, looked in the area of the toilet for two seconds and saw that it was clogged and filled with trash, and thus *might* have been able to see trash or a fentanyl capsule on the floor near the toilet (though he did not recall having seen anything). Instead of cleaning up the toilet or any other trash in R-7 himself, Bishop notified a supervisor so that someone else could do so. Asked whether he was aware that trash was able to hide contraband in a jail cell, Bishop testified "I mean, I'm not an expert on it. Maybe. I don't know." Def.'s Ex. E, Doc. 41-2, Bishop Dep., at 39:11-20. In his personal experience, he had not seen that happen. *Id.* at 39:21-23. The Jail had procedures for preventing the introduction of contraband, including pat searching and strip searching inmates before they entered R-7; there is no evidence that those procedures were not being followed on the May 20, 2019, or that Bishop had any reason to believe they were not being

followed on that day. Moreover, Bishop did not know Soliz prior May 20, 2019, and there is no evidence that Bishop had any reason to think Soliz was particularly likely to ingest drugs if he were to find them on a jail floor.

In sum, there is no evidence that Bishop saw drugs in R-7, that he saw trash in R-7 that could have been concealing drugs, that he had personal experience or knowledge that trash could conceal drugs, that he knew of any reason to think that drugs would likely be present in R-7, or that he knew of any reason that Soliz would be likely take such drugs if they were present. On these facts, no reasonable juror could find that Bishop was aware of facts from which an inference could be drawn that Soliz was at risk of ingesting illegal substances while in R-7, or that he actually drew that inference.

Plaintiff's arguments are unpersuasive. Plaintiff argues that because Bishop acknowledged that he was "maybe" aware that trash in a jail cell can hide contraband or drugs, and because Director Keen testified that any time an officer sees any type of dirt or garbage in R-7, it should be cleaned up immediately and all officers know this, "it is reasonable to expect that Bishop would have taken steps to keep R-7 clean and free from contraband." Pl.'s Mem. Opp'n S.J., Doc. 46, at 8. Plaintiff argues that Bishop could have saved Soliz's life by spending a few extra seconds to make sure R-7 was clean, but did not do so because he would not pick up other people's trash. In hindsight, it might have been commendable for Bishop to have looked for trash near the toilet, drawn an inference that it might conceal contraband, and picked it up himself to ensure that it did not. As discussed above, however, a constitutional claim is not established by showing that in hindsight, a defendant could have recognized a risk and could have prevented harm by acting differently. Instead, it requires a "reckless disregard of [a] known risk." *See Holden* 663 F.3d at 341.

14

For all of the above reasons, the Court finds that Bishop did not violate Soliz's constitutional rights, and he is entitled to summary judgment. In the alternative, even assuming, *arguendo*, that a reasonable juror could find that Bishop violated Soliz's constitutional rights, the Court finds that Bishop is entitled to qualified immunity because that right was not clearly established. As the case law cited above makes clear, this area of the law is unsettled. Notably, Plaintiff does not cite a single case from any jurisdiction in which a plaintiff has succeeded on a deliberate indifference claim based on failure to protect an inmate from exposure to illegal drugs. The Court certainly cannot say that a reasonable official in Bishop's position "would have known that his actions were unlawful" when he did not immediately clean up trash on the floor of a jail cell. *See Edwards* 750 F.3d at 731-32,

For all of the above reasons, Bishop and Keen are entitled to summary judgment on Plaintiff's failure to prevent harm claim.

## 2. Deliberate Indifference to Medical Needs Claim (against Bishop and Keen in Their Individual Capacities)

Plaintiff also alleges in her Complaint that Bishop and Keen failed to provide constitutionally adequate medical care because they were deliberately indifferent to Soliz's objectively serious medical needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104) (1976)). To prove a deliberate indifference to medical needs claim, Plaintiff must show: "(1) [the inmate] suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Johnson*, 929 F.3d at 575 (citing *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily

recognize the necessity for a doctor's attention." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotation marks omitted).

Defendants argue that Soliz did not suffer objectively serious medical needs, because he never displayed a serious medical condition or need that would have been obvious to a layperson, and because nothing in the record establishes the existence of a physician's diagnosis or other medical evidence indicating a need for treatment. Defendants also argue that Plaintiff cannot prove that Keen or Bishop actually knew of, but deliberately disregarded, Soliz's medical needs. It is undisputed that Keen was not present at the time of the events in question and that Bishop was present in R-7 with Soliz for only fifteen seconds, during which time Soliz did not display any signs or symptoms of medical needs.

Plaintiff provides no response to Defendants' arguments and points to no evidence from which a jury could find in her favor on either element of the deliberate indifference to medical needs claim. Thus, the Court considers this claim waived. *See Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009); *Wegmann v. Ethicon, Inc.,* No. 4:20-CV-00704 JAR, 2020 WL 5814475, at *11 (E.D. Mo. Sept. 30, 2020). Even absent a waiver, the Court agrees with Defendants that they would be entitled to summary judgment for the reasons set forth above and in Defendants' motion.

### 3.   Failure to Train and Supervise Claim (Against Keen in His Individual Capacity)

The Court next considers Plaintiff's claim that Keen is personally liable because he failed to train and supervise his employees. Specifically, Plaintiff argues that Keen was aware that cleanliness was a safety issue, yet failed to train and supervise his employees with regard to cleaning procedures.

16

"A supervisor may be liable under section 1983 if [his or her]'failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.'" *Davis v. Buchanan Cty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted)). To establish such a claim, "[t]he plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Wever v. Lincoln Cty., Nebraska*, 388 F.3d 601, 606 (8th Cir. 2004) (quoting *Andrews*, 98 F.3d at 1078). *See also Davis,* 11 F.4th at 624 ("When a 'supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.'") (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)). "This 'rigorous standard' requires proof that the 'supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right.'" *Id.* (quoting *Krigbaum*, 808 F.3d at 340). "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Id.* (quotation marks omitted).

Defendants argue that because Bishop did not violate Soliz's constitutional rights by failing to clean up trash in R-7, Plaintiff's supervisory liability claim based on that violation fails as well. Defendants are correct that "[i]n the absence of any underlying constitutional violation by [the subordinate], the failure-to-supervise claim "automatically fail[s]." *Engesser v. Fox*, 993 F.3d 626, 631–32 (8th Cir. 2021) (quotation marks omitted). *See also Johnson v. City of Ferguson, Missouri,* 926 F.3d 504, 507 (8th Cir. 2019) ("In light of our holding that no seizure and thus no constitutional violation occurred in this case, Johnson's claim of supervisory liability against Chief Jackson

17

necessarily fails."). However, because it is theoretically possible that some Jail official other than Bishop might have committed an underlying constitutional violation related to the alleged failure to train or supervise employees in cleaning procedures, the Court will not grant summary judgment on this basis.

Even assuming, *arguendo*, that Bishop's or someone else's failure to clean R-7 violated Soliz's constitutional rights, no reasonable jury could find that Keen had notice of a pattern of unconstitutional acts committed by a subordinate or that Keen was deliberately indifferent to or authorized those acts. Plaintiff argues that Keen knew that cleanliness was a safety issue, noting Keen's testimony that there should be cleaning done in R-7 immediately any time an officer sees garbage; Keen's description of R-7 as being "dirty" at the time of Soliz's death; the NIC Assessment indicating that Unit R-7 was in need of routine cleaning and maintenance; and Keen's acknowledgment that what the Jail could have done better with regard to Soliz's situation was to better clean R-7. Plaintiff further argues that Keen was on notice of the risk of contraband entering the Jail, noting that in the year before Soliz's death, there were five reported incidents of suspected narcotics being found or used in the Jail.

Although the above evidence suggests, generally, that Keen was aware that cleaning of R-7 was important and that narcotics sometimes entered the Jail, it does not support a finding that Keen was aware of a pattern of unconstitutional misconduct, let alone unconstitutional misconduct similar to the conduct allegedly giving rise to liability here. There is no evidence that any of the prior incidents involving drugs in the Jail involved deficient cleaning by Jail staff. Plaintiff points to no evidence that other such incidents occurred or that Keen was aware of them. Keen did not have notice, through the cited prior incidents or otherwise, that the County's training or supervision related to cleaning were inadequate or would likely result in a constitutional violation.

For all of the above reasons, Keen is entitled to summary judgment on Plaintiff's failure to supervise or train claim. In the alternative, even assuming, *arguendo*, that a reasonable juror could find that Keen violated Soliz's constitutional rights, the Court finds that he is entitled to qualified immunity because that right was not clearly established. Again, Plaintiff does not cite a single case from any jurisdiction in which a plaintiff has succeeded on a deliberate indifference claim based on failure to protect an inmate from exposure to illegal drugs. The Court certainly cannot say that a reasonably official in Keen's position "would have known that his actions were unlawful" when he did not train his employees to immediately and personally clean up any trash they observed or to clean a holding cell more often than four times a week.

### 4. Municipal Liability Claims (Against the County and Keen in His Official Capacity[4])

Plaintiff's final federal claim is that the County, and Keen in his official capacity, failed to maintain appropriate policies, customs, and practices to keep the Jail free from illegal narcotics, and failed to train and supervise correctional offers on the topic of cleaning in order to keep the Jail free from illegal narcotics. Plaintiff argues that these failures constituted deliberate indifference to the constitutional rights of inmates. The Court will consider separately the policies, customs, and practices claim and the failure to train and supervise claim.

#### a. Policies, Customs, and Practices

"To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental

---

[4] The suit against Keen in his official capacity is actually a suit against the County, so the Court refers only to the County in this section of the opinion. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 800 (8th Cir. 1998) ("Liability for city officials in their official capacities is another form of action against the city . . . .").

entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009). There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Id*. at 817-18. Similarly, "an absence of a policy can create liability under § 1983 only 'where a [municipality's] inaction reflects a deliberate indifference to the constitutional rights of the citizenry." *Powell v. St. Francois Cty.*, No. 4:14-CV-1230-AGF, 2016 WL 659085, at *8 (E.D. Mo. Feb. 18, 2016) (quoting *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 392 (8th Cir. 2007)).

In the context of a deliberate indifference claim brought against a municipality, the Eighth Circuit has noted that "[i]ndifference is apathy or unconcern." *Rellergert by Rellergert v. Cape Girardeau Cty.* 924 F.2d 794, 797 (8th Cir. 1991). "The standard for deliberate indifference in municipal liability is objective; a governmental entity is liable if it has maintained 'a policy in which the inadequacy is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights' that the policymakers can be said to have been deliberately indifferent. *Moyle*, 571 F.3d at 818-19 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390) (1989). "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. City of Mountain View, Mo*., 709 F.3d 1201, 1216 (8th Cir. 2013).

In addition to showing deliberate indifference, the plaintiff must also demonstrate a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton,* 489 U.S. at 385. Plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997). Where municipal liability is asserted, "rigorous standards of culpability and causation must be applied to ensure that the municipality is

not held liable solely for the actions of its employee." *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Brown*, 520 U.S. at 405).

Defendants argue that they are entitled to summary judgment on this claim because there is no evidence of an underlying constitutional violation by a County employee; because there is no evidence to support a finding that the County was deliberately indifferent to a known or obvious risk; and because there is no evidence of a direct causal link between the County's policies and Soliz's injury.

The Court first addresses the argument that this claim fails because of the absence of an underlying constitutional violation. There is authority in the Eighth Circuit to support the position that because the Court has granted summary judgment on the individual liability claims, the municipal liability claim must fail. *See, e.g.*, *Johnson v. City of Ferguson, Missouri*, 926 F.3d 504, 506 (8th Cir. 2019) ("This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.") (quoting *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005)). However, the Eighth Circuit has also found that although there must be a violation of the plaintiff's constitutional rights by municipal employees to support a municipal liability claim, it is not always necessary to have a finding of individual liability before imposing municipal liability. *See Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002). It has noted that "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation." *Id*. The court emphasized that whether this is possible depends on "the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors." *Id.* Here, because it is possible that the municipal liability claim might be based on a constitutional violation committed by another

employee or combination of employees, the Court will not grant summary judgment on this claim solely because it granted summary judgment in favor of Bishop and Keen on the individual claims against them.

The Court next turns to the question of whether a reasonable juror could find that the County's policies (or lack thereof) related to the introduction of drugs into the Jail demonstrated deliberate indifference to inmates' constitutional rights. The Court first notes that it is somewhat unclear what specific policy or custom Plaintiff is challenging. She does not point to a specific policy or custom that caused a constitutional violation, nor does she identify any specific policy or custom that should have been adopted but was not. She essentially argues that because the County knew that drugs had entered the Jail on five occasions prior to Soliz's death and knew of several factors that might increase the risk of introduction of drugs into the Jail, the County should have done more to address those risk factors. Specifically, Plaintiff argues that the County knew that the physical layout of the booking area, which allows mixing of inmates who have been searched with those who have not, increases the risk that contraband will be exchanged; that the County knew that having inmates spend a long time in the booking area and/or R-7 increases the risk that contraband will be exchanged; and that the County knew that cleanliness was a safety issue because trash could hide contraband.

As a preliminary matter, the undisputed facts show that at the time of Soliz's death, the Jail did have in place numerous detailed policies and practices expressly aimed at limiting the introduction of contraband into the Jail. Inmates entering the Jail were pat searched, strip searched (requiring clothing removal, clothing searches, examination of fingers, ears, mouth, penis, scrotum, and feet and direction to squat and cough hard three times), and body scanned[5] before

---

[5]  Plaintiff suggests that there is a dispute of fact about whether the body scanner was in use on the date of Soliz's death, based on the conflicting deposition testimony of officers regarding when

they entered R-7. These practices are set forth in several written policies, including a "Contraband Control" policy (effective March 7, 2011, and revised August 29, 2011) that sets forth requirements for searching packages and individuals entering the jail; a "Searches" policy (effective March 7, 2011, and revised August 29, 2011), which has as one of its stated purposes "to prevent the introduction of weapons or other dangerous contraband"; and a "Body Scanner" policy (effective February 21, 2019), whose stated purpose is "the detection of contraband hidden on a person or inside the body of persons mandated to this facility."). There was also a "Facility Housekeeping" policy, effective November 2014, that provided that corrections staff were responsible for supervising and inspecting daily cleaning and sanitation performed by inmates, though deposition testimony shows that cleaning was actually only conducted four times a week.

In the related context of claims of deliberate indifference to the risk of jail suicides, the Eighth Circuit has repeatedly granted summary judgment in favor of defendants who had in place policies that, even if not perfectly effective, demonstrated that the defendants that were interested in preventing jail suicides and were taking affirmative steps to reduce the risk. *See A.H. v. St. Louis Cty., Missouri,* 891 F.3d 721, 728-29 (8th Cir. 2018) (affirming summary judgment on a claim that a county was deliberately indifferent to jail suicides because its policy allowed inmates on precautionary status to be alone in their cells, permitted them to have bed sheets, and did not require them to be monitored more than the inmate population at large when in general housing, and because there had been two previous suicides and twenty-two attempts in a five-year period;

---

the body scanner began to be implemented. But in light of the documentary evidence showing that the policy requiring a body scanner was effective February 21, 2019, and the body scanner logs showing that the body scanner was actively in use on the day Soliz entered the Jail (and for several days before and after), the Court finds that no reasonable juror could find that the body scanner was not in use at the time of Soliz's death. The Court further notes that Plaintiff's own expert, in his report, acknowledges and analyzes the body scans completed on May 19, 2019. *See* Harmening Report, Doc. 45-1.

pointing to the numerous policies that had been put place to prevent jail suicides); *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (affirming summary judgment in favor of a county on claim that county was deliberately indifferent to jail suicides; noting that county "did have policies in place which were intended to prevent inmate suicides" and that "[t]he existence of these policies indicate[s] that the County was interested in preventing inmate suicides and, in fact, took affirmative steps to prevent such suicides"); *Nadeau v. Shipman*, 471 F. Supp. 3d 952, 980 (D.N.D. 2020) (granting summary judgment on claim that a prison's suicide prevention policy was grossly inadequate, contrary to the correctional standard of care, and deliberately indifferent to the risk of suicide; finding that although the facility's policy "was hardly a model for best practices," "the standard is deliberate indifference and an inadequate suicide prevention policy, while not being optimal, still does not prove a constitutional violation").

In light of the Jail's policies and practices outlined above, it is clear that the County was not "indifferent to"—apathetic or unconcerned about—the risk of contraband entering the Jail, but instead was concerned about that issue and was actively taking affirmative steps to address it. Nevertheless, Plaintiff offers several arguments for her position that that by not doing more to address the factors she identified, Defendants were deliberately indifferent to the risk of illegal narcotics entering the Jail. The Court finds these arguments are unpersuasive.

First, Plaintiff relies on a 2010 NIC Assessment identifies numerous problems with the physical layout and procedures at the Jail. However, a review of that Assessment shows that it does not expressly discuss how any of those problems had, or even could, lead to the introduction of contraband or drugs into the jail. The few isolated sentences identified by Plaintiff, which do not mention drugs or contraband, in a 97-page report, did not give the County notice that any of its policies with regard to drugs and contraband were constitutionally inadequate. Moreover, even if the County did not address *the specific issues raised in the assessment*, it is undisputed that in

24

the years between that assessment and Soliz's death, the County adopted several policies directed toward addressing the risk of introduction of contraband.

Second, Plaintiff relies on the prior incidents involving finding drugs at the jail, one of which involved a fatal overdose. These incidents certainly indicate that the Jail's policies in late 2018 and early 2019 were not perfectly effective in preventing the introduction of drugs to the Jail. However, Plaintiff points to no evidence demonstrating that any of the factors identified by Plaintiff (the layout of the booking area, the time inmates spent in the booking area, or inadequate cleaning) caused these incidents, so the Court cannot say that these incidents placed the County on notice that the failure to address those factors was likely to cause constitutional violations. The Court further notes that these incidents occurred prior to the effective date of the body scanner policy; this indicates that after those incidents occurred, the County was continuing to take new, affirmative steps to address the issue of contraband.

Third, Plaintiff points to the deposition testimony of various officers regarding the risks of cross-contamination between inmates who had been searched and others, in light of the physical layout of the booking area and the time inmates spent in R-7. The physical layout of the booking area is not a policy (a "deliberate choice of a guiding principle or procedure made by the [ ] official who has final authority regarding such matters," *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)), nor is it a custom, and Plaintiff does not explain how it can give rise to municipal liability. Moreover, Plaintiff points to no evidence that the County was deliberately indifferent to the risks posed by the physical layout of the booking area. In addition to implementing the policies and practices discussed above, Keen testified that in light of the "restrictions due to the layout of the booking area," there was "a directive [to staff] to do their best" to keep individuals who had been searched separated from individuals who had not. Def.'s Ex. H, Doc. 41-5, Keen Dep. 21:20-25; 22:1-5. With regard to the time inmates spent in the booking area, even though Keen

25

acknowledged that it could increase the risk of cross-contamination, there is no evidence that the County knew that it had ever caused any introduction of drugs or any violation of an inmate's constitutional rights.

Finally, Plaintiff suggests that the County should have done more to keep the Jail clean, because Keen and other Jail employees knew that cleanliness was a safety issue and that garbage in a cell could hide contraband and because Keen's and Basler's testimony suggested that cleaning R-7 might have prevented Soliz's death. As discussed above, however, there is no evidence that lack of cleaning had led to any prior incidents involving drugs in the Jail, and the County did not have notice, through the cited prior incidents or otherwise, that County's cleaning policies or customs were inadequate or would likely result in a constitutional violation. The hindsight view that more frequent cleaning of R-7 might have prevented the incident does not support a finding of deliberate indifference. *See Moyle*, 571 F.3d at 819 (finding that deposition testimony that "reflects the administrator's hindsight assessment of the situation preceding [the inmate's] death" did "not support the conclusion that the county failed to adopt adequate safeguards as the result of a 'deliberate choice to follow a course of action' in the face of obvious risk to inmate safety"). *See also City of Canton*, 489 U.S. 378, 391–92 (1989) ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident..").

In sum, the Court does not find sufficient evidence to permit a reasonable juror to find that the County was deliberately indifferent to the rights of its inmates with respect to exposure to illegal drugs in the Jail. Far from showing "apathy or unconcern," *Rellergert*, 924 F.2d at 797, the County took affirmative steps to attempt to prevent the introduction of drugs and other contraband into the Jail, including implementing several detailed policies specifically directed toward protecting against the introduction of contraband. Moreover, the County did not simply implement

policies long ago and then act with indifference to whether they were effective, but added new ones to attempt to better address the issue—including, most recently, introduction of a body scanner just a few months before Soliz's death. Although the Jail may not have addressed every possible risk factor, the constitution did not require it to do so. The County's policies, or failure to enact additional policies, did not demonstrate deliberate indifference to inmates' risk of exposure to illegal narcotics. Thus, the County, and Keen in his official capacity, are entitled to summary judgment. *See A.H.*, 891 F.3d at728 (8th Cir. 2018); *Liebe*, 157 F.3d at 579; *Nadeau*, 471 F. Supp. 3d at 980.

### b. Failure to Train or Supervise

Finally, the Court considers Plaintiff's claim that the County is liable for a failure to train or supervise employees its officers to constantly clean R-7. To impose municipal liability under a failure to train theory, the plaintiff must show that "(1) the [County's] . . . training practices are inadequate; (2) the [County] was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality; and (3) an alleged deficiency in the [County's] training procedures actually caused the plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (internal citations and quotation marks omitted).

This claim fails for the same reasons that the supervisory liability claim against Keen failed—there is no evidence from which a reasonable juror could find that the County had notice, through the prior incidents involving narcotics or otherwise, that the County's training and procedures related to cleaning were inadequate or would likely result in a constitutional violation. Additionally, as with the other municipal liability claims, in light of the many affirmative and reasonable steps the County took to address the issue of illegal drugs entering the Jail, no reasonable juror could find that the failure to take this additional step satisfies the "rigorous

standard[] of culpability" necessary to support a municipal liability claim. Accordingly, the County, and Keen in his official capacity, is entitled to summary judgment.

### B. State Law Claims

Because the Court is dismissing all of the federal claims in this lawsuit, the Court next considers whether to exercise supplemental jurisdiction over the remaining state law claims. A district court may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)). However, the Eighth Circuit has stated that "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cty*., 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988)). This reflects the policy that the federal courts should "exercise judicial restraint and avoid state law issues whenever possible" and should "provide great deference and comity to state court forums to decide issues involving state law questions." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). *See also Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000) ("When state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity.") (quotation marks omitted).

Here, after consideration of the relevant factors, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which involve numerous questions of

state law that would be better determined by the Missouri state courts. Accordingly, Plaintiff's state law claims (Counts III and IV) will be dismissed without prejudice. To the extent that the motions for summary judgment are directed toward the state law claims, they are denied as moot.

## IV.   CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment. (Doc 39) is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 (Counts I and II) and **DENIED** as moot as to Plaintiff's claims under state law (Counts III and IV).

**IT IS FURTHER ORDERED** that Plaintiff's claims under 42 U.S.C. § 1983 (Counts I and II) are **DISMISSED**, with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's claims under state law (Counts III and IV are **DISMISSED**, without prejudice.

**IT IS FURTHER ORDERED** that all other pending motions in this case are **DENIED** as moot.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of April, 2022.